IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION

| | | |
|---|---|---|
| RENATE ALDRIDGE, MARC ARCHIBALD, | § | |
| SHELBY AUSTIN AND BRENDA AUSTIN, | § | |
| DAVID BALDREE, KAREN BIRMINGHAM, | § | |
| KAREN BIRMINGHAM INSURANCE | § | |
| AGENCY, INC., KATHY BOWLSBY AND | § | |
| BRUCE BOWLSBY, KIMBERLY BROOKEY, | § | |
| CAMERON BROWN, CBS, INC., GINGER | § | |
| CAMERON, ESMERALDA CASIMIRO, | § | |
| JACK CASSELL, FONG CHENG, | § | |
| KYLE COFFEY, COFFEY INSURANCE | § | |
| SERVICES, INC., HARVEY COHEN, COHEN | § | |
| INSURANCE AGENCY, VONDA CRAIG, | § | |
| TIM CRAWLEY, GHANEN INSURANCE | § | |
| AGENCY, LENARD CROCKETT, SALLY | § | |
| DALEY, S&B INSURANCE, L.L.C., STACY | § | |
| DANNER, SKC INSURANCE SERVICES, | § | |
| INC., JOLENE DEGES, HANS DESPAGNE, | § | |
| GILBERT EASTMAN AND DEBORAH | § | |
| EASTMAN, RICK ENCE, WILLIAM FREEMON, | § | |
| BLAKE FRIBOURG AND CHRIS FRIBOURG, | § | |
| FRIBOURG, L.L.C., JOSH GARCIA AND | § | |
| DEANNA L. GARCIA, GARCIA INSURANCE | § | |
| GROUP, MONICA L. GARCIA, MARK E. | § | |
| GENGLER, WLM MANAGEMENT, INC., | § | |
| GDC MANAGEMENT, INC., GIC | § | |
| MANAGEMENT, INC., GENGLER | § | |
| INVESTMENT CO., INC., CHRISTINA GOODE, | § | Civil Action No. 09-CV-2178 CM/KGS |
| LILIA GHAZARIAN, MIKE GUTIERREZ, | § | |
| RICARDO M. GUTIERREZ AND MARTHA I. | § | |
| GUTIERREZ, DAVID W. HAMILL AND | § | |
| MARIANNA HAMILL, HAMILL & HAMILL | § | |
| INSURANCE AGENCY, L.L.C., HAMILL & | § | |
| HAMILL INSURANCE AGENCY, L.L.C. II, | § | |
| RABIH HAMAWI, NICHOLAS J. HAMMER | § | |
| AND KELLIE K. HAMMER, NICK HAMMER | § | |
| AGENCY, INC., JESSICA HERNANDEZ, | § | |
| MICHAEL HILTON, JAN HOFFINSINGER, | § | |
| TREEROCK ENTERPRISES, INC., MATT W. | § | |
| IKLE, SAVE ON MICHIGAN INSURANCE, | § | |
| INC., BORIS JAFRE AND DUNIA NODA, | § | |
| WPB INSURANCE OFFICE, INC., CHRISTY | § | |
| LAMAS, BRIAN LOVSEY, DAN MADELEY, | § | |

RANDOLPH A. MADRY, RAM SPECIALTIES          §
COMPANY, INC., FINANCIAL SPECIALTIES        §
COMPANY, INC., JEFF MARKOVIC,               §
BOB J. McGONIGLE, McGONIGLE                 §
INSURANCE, L.L.C., LINDA MEINZER AND        §
CARLA L. REAY, LADONNA MILLER,              §
REASOURCE GROUP, DOUG MINTER,               §
MINTER CONSULTING, L.L.C., RANDY L.         §
MONROE, DAVID MORRIS, MORRIS                §
INSURANCE AGENCY, LYNNE OAKLEY,             §
CLIFTON TODD PEBSWORTH AND ROBIN            §
JOY PEBSWORTH, PEBSWORTH INSURANCE §
AGENCY, INC., ASHER ROSS, INC.,             §
2KIDS, L.L.C., ADAM PETERS, ADAM PETERS§
AGENCY, INC., JEREMY POOL AND ALICIA        §
CROWLEY-POOL, JEREMY POOL AGENCY,           §
INC., SCOTT PRATHER, TONY REDENDO,          §
AJ INSURANCE AND INVESTMENTS, ULR           §
INSURANCE AGENCY, L.L.C., JOEL RITTER,      §
R&S INSURANCE, L.L.C., AARON ROBERTS,       §
LIONEL SANABRIA, PETE SCHATZ,               §
JPS INSURANCE AGENCY, L.L.C.,               §
PJS INSURANCE AGENCY, .L.L.C.,              §
AJS INSURANCE AGENCY, L.L.C., JANIE         §
SERRATO, LINDA STITES, NEIGHBORS            §
INSURANCE SERVICE, L.L.C., KARI M.          §
VANSICKLE AND WILLIAM VANSICKLE,            §
KARI'S INSURANCE SERVICE, PHILOMENA         §
VISCARDO AND REBECCA COSTELLO,              §
DINGMAN DELAWARE INSURANCE                  §
AGENCY, LINDA C. WALLACE AND                §
LARRY W. WALLACE, THE WALLACE               §
AGENCY, L.L.C., GARRY L. WHITE, AND         §
DIANE WILLIAMS                              §
      Plaintiffs,                              §
                                            §
v.                                          §
                                            §
ALERITAS CAPITAL CORPORATION                §
      Defendant                                §

## PLAINTIFFS' ORIGINAL COMPLAINT

      NOW COMES Renate Aldridge, Marc Archibald, Shelby Austin and Brenda Austin,

David Baldree, Karen Birmingham, Karen Birmingham Insurance Agency, Inc., Kathy Bowlsby

and Bruce Bowlsby, Kimberly Brookey, Cameron Brown, CBS, Inc., Ginger Cameron, Esmeralda Casimiro, Jack Cassell, Fong Cheng,      Kyle Coffey, Coffey Insurance Services, Inc., Harvey Cohen, Cohen Insurance Agency, Vonda Craig, Tim Crawley, Ghanen Insurance Agency, Lenard Crockett, Sally Daley, S&B Insurance, L.L.C., Stacy Danner, SKC Insurance Services, Inc., Jolene Deges, Hans Despagne, Gilbert Eastman and Deborah Eastman, Rick Ence, William Freemon, Blake Fribourg and Chris Fribourg, Fribourg, L.L.C., Josh Garcia and Deanna L. Garcia, Garcia Insurance Group, Monica L. Garcia, Mark E. Gengler, WLM Management, Inc., GDC Management, Inc., GIC Management, Inc., Gengler Investment Co., Inc., Christina Goode, Lilia Ghazarian, Mike Gutierrez, Ricardo M. Gutierrez and Martha I. Gutierrez, David W. Hamill and Marianna Hamill, Hamill & Hamill Insurance Agency, L.L.C., Hamill & Hamill Insurance Agency, L.L.C. II, Rabih Hamawi, Nicholas J. Hammer and Kellie K. Hammer, Nick Hammer Agency, Inc., Jessica Hernandez, Michael Hilton, Jan Hoffinsinger, Treerock Enterprises, Inc., Matt W. Ikle, Save On Michigan Insurance, Inc., Boris Jafre and Dunia Noda, WPB Insurance Office, Inc., Christy Lamas, Brian Lovsey, Dan Madeley, Randolph A. Madry, RAM Specialties Company, Inc., Financial Specialties Company, Inc., Jeff Markovic, Bob J. Mcgonigle, Mcgonigle Insurance, L.L.C., Linda Meinzer and Carla L. Reay, Ladonna Miller, Reasource Group, Doug Minter,      Minter Consulting, L.L.C., Randy L. Monroe, David Morris, Morris Insurance Agency, Lynne Oakley, Clifton Todd Pebsworth and Robin Joy Pebsworth, Pebsworth Insurance Agency, Inc., Asher Ross, Inc., 2kids, L.L.C., Adam Peters, Adam Peters Agency, Inc., Jeremy Pool and Alicia Crowley-Pool, Jeremy Pool Agency, Inc., Scott Prather, Tony Redendo, AJ Insurance and Investments, ULR Insurance Agency, L.L.C., Joel Ritter, R&S Insurance, L.L.C., Aaron Roberts, Lionel Sanabria, Pete Schatz, JPS Insurance Agency, L.L.C., PJS Insurance Agency, .L.L.C., AJS Insurance Agency, L.L.C., Janie Serrato,

Linda Stites, Neighbors Insurance Service, L.L.C., Kari M. Vansickle and William Vansickle, Kari's Insurance Service, Philomena Viscardo and Rebecca Costello, Dingman Delaware Insurance Agency, Linda C. Wallace and Larry W. Wallace, The Wallace Agency, L.L.C., Garry L. White, and Diane Williams, Plaintiffs in the above-entitled and numbered cause, and files this, their Original Complaint and show unto the Court the following:

## I.
## PARTIES

1.1    Plaintiffs are individuals and businesses who entered into Agreements for Advancement of Loans with Defendant and are citizens of various states.

1.2    Defendant, **ALERITAS CAPITAL CORPORATION** is a Delaware Corporation with a principal place of business in Overland Park, Kansas.  The Defendant may be served by serving the Special Master, Albert Reiderer at 1100 Main Street, Suite 2800, Kansas City, Missouri 64105.  Defendant formerly operated under the name of Brooke Credit Corporation.

## II.
## JURISDICTION & VENUE

2.1    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because some of Plaintiffs' claims arise under the laws of the United States.  Venue is proper in the District of Kansas because Defendant is a resident of Kansas and a substantial part of the events or omissions giving rise to the claim occurred in the District of Kansas and the Kansas City Division.

## III.
## FACTUAL BACKGROUND

3.1    Aleritas is a subsidiary of Brooke Corporation.  Its sole purpose is to lend money to individuals and businesses such as Plaintiffs for the purchase of insurance agencies from Brooke

4

Corporation or one of its affiliates or subsidiaries.  Brooke Corporation and its subsidiaries or affiliates are collectives referred to as the "Brooke entities."

3.2     Brooke Corporation was incorporated in 1986.  In approximately 1996, Brooke Corp. began to develop a franchise network of predominantly property and casualty insurance agents. At around the same time, Brooke Corporation established Brooke Credit Corporation (n/k/a Aleritas Capital Corporation) for the purpose of lending money to the franchise agents for the purchase of their agencies from Brooke Corporation.  Brooke Credit was created, in part, because there was no good market for these loans as traditional lending institutions, such as banks, would not loan full value, if any at all, for the purchase of an insurance agency.  Until 2003, the franchise network was loosely run and consisted of approximately one hundred agencies in less than ten states.

3.3     In 2003, Brooke Corporation went public and began to dramatically expand its franchise network.   Around the same time, Brooke Corporation transferred the franchise activities to Brooke Franchise Corporation ("Brooke Franchise"), a wholly owned subsidiary.   However, Brooke Corporation continued to provide administrative services to the franchise network. Brooke Franchise later changed its name to Brooke Capital Corporation ("Brooke Capital").

3.4     Brooke Corporation and its subsidiaries, including Defendant, utilized a uniform series of transactions and documents to develop their franchise network.  Most form documents were part of the Brooke entities Uniform Franchise Offering Circular (UFOC).  They built the network two ways: selling existing agencies and developing a start-up agency program.

**Sales of Existing Agencies**

3.5     Brooke Capital purchased an insurance agency or agencies from a third party.  On the same day and usually simultaneously, Brooke Capital sold the agencies to a franchise agent, such

as Plaintiffs, through an agreement called an Agreement for Sale of Agency Assets.  According to the purchase and sales agreements, Brooke Capital purchased the agency or agencies for the same price as they sold them to Plaintiffs.

3.6     Part of the sales transaction included a Consulting Agreement between Brooke Capital and the third parties.  The Consulting Agreement called for the third party to pay back a portion of the sales price, usually 10%, to Brooke Capital.  The Consulting Agreement was never disclosed to the Plaintiffs.  Moreover, Brooke Capital provided no services to earn or justify the fee.  It was merely a mechanism for the Brooke entities to hide the true purchase price of the agencies from Plaintiffs.

3.7     In addition to the sales agreement, buyers such as Plaintiffs were required to enter into a standard Franchise Agreement with Brooke Capital.  Under the Franchise Agreement, Brooke Capital was responsible for accounting for all premiums and commissions, among other obligations.  Specifically, Brooke Capital was responsible for receiving premiums from policyholders and forwarding them to the various insurance carriers for the purchase of insurance policies.  Brooke Capital was also responsible for receiving commissions from the various insurance carriers and paying 85% of the commissions to the franchise agents by the 20th of every month.  The franchise agreement also required that all contracts with insurance carriers be written through one of the Brooke entities, usually Brooke Agency Services Company LLC ("BASC").

3.8     During the majority of time, Brooke Capital also required its franchise agents to enter into a Buyers Assistance Plan (BAP) when they purchased their agency.  Brooke Capital charged approximately 50% of the agency's annual commissions for the BAP.  In exchange, Brooke Capital or one of its affiliates was supposed to provide various consulting services to the

franchise agents.   In reality, none of the Brooke entities provided any meaningful consulting services and the franchise agents received no value for the BAP.  The BAPs were just another mechanism for the Brooke entities to extract transaction fees.

3.9     Aleritas provided loans to essentially 100% of the franchise agents to purchase their agency or agencies from Brooke Capital.  The loans were memorialized through an Agreement for Advancement of Loan in additional to the actual loan documents.

3.10    The Brooke entities controlled all aspects of the purchase and sale of agencies.  Significantly, the Brooke entities were in charge of conducting the due diligence on the insurance agencies they were buying from third parties and selling to Plaintiffs.  This included, but was not limited to, confirming the prior commissions of the agencies and valuing the agencies.  Verifying prior commissions was critical because the value of the agencies was based almost exclusively on prior commissions.  Agencies were usually priced based on a multiple of annual commissions.  Defendant played a large role in the evaluation of the agencies.  Franchise agents, including Plaintiffs, were required to contract with the Brooke entities for the valuation services through the BAP or similar agreements and were prohibited from communicating directly with the selling agents about any aspect of the transactions or the agencies.

3.11    The Brooke entities did no real evaluation of the agencies.  Since they were merely selling the agencies to Plaintiffs, they did not care about the true value.  In fact, the Brooke entities profited by inflating the value and commissions of the agencies.

3.12    Unlike a traditional franchise network, the Brooke entities did not want their franchise agents to succeed.  Instead, the success of the Brooke entities, including Defendant, relied on the failure of its franchise agents such as Plaintiffs.  Over 50% of the Brooke entities revenue was earned from transaction fees related to the purchase of agencies from third parties and the sale of

the same agencies to franchise agents such as Plaintiffs.  The largest portion of the transaction fees came from Consulting Agreements and BAPs.  In order to increase transaction fees, the Brooke entities including Defendant, artificially inflated the value of the agencies sold to Plaintiffs.  The higher the value of the agencies, the higher the Franchise Fees, Consulting Fees, BAPs and other fees they could charge Plaintiffs.  Moreover, the more franchise failures meant the more times the Brooke entities could resell the same agencies and generate additional transaction fees.  Some agencies were sold multiple times by the Brooke entities.

3.13   The Brooke entities fraud in overstating the value of the agencies and taking kickbacks from the sellers of the agencies ensured that Plaintiffs would rarely, if ever, cash flow.  As a result, Plaintiffs either lost their agencies back to the Brooke entities or went deeper into debt to Defendant.

3.14   At the height of its success, the Brooke franchise network had over 750 franchise locations in more than 30 states.  In order to perpetuate the fraud, the Brooke entities had to continue to generate transaction fees.  This meant continuing sell or re-sell agencies to franchise agents such as Plaintiffs.  By 2006, suspicions about Brooke's fraud began to grow and the pace of selling agencies began to slow down.

### Start Up Agency Program

3.15   As sales of existing agencies began to slow, the Brooke entities began their Start Up Agency Program (SUP).  The idea was to add to the franchise network by setting up people in brand new franchise agencies.  At one point, the Brooke entities had a goal of adding fifty start up agents per month.

3.16   The concept sold to the start up agents was that the Brooke entities would provide a turn key operation to them.   The Brooke entities would provide them with an office location,

equipment and support staff.  The Brooke entities would provide the start up agents with all necessary insurance company appointments and help them establish customers.  Finally, the Brooke entities would provide them with training and advance them funds for at least the first six months of operation.

3.17   Start up agents were required to sign a Franchise Agreement similar to existing agents and pay a franchise fee in excess of $150,000.  Defendant provided the start up agents with financing for the franchise fees and operating expenses.  After getting the start up agents to sign the documents and borrow the funds, the Brooke entities never provided the services they promised.  Office locations were delayed or never provided.  The Brooke entities did not provide support services, insurance company appointments and training.  As a result, the startup agents went into debt to Defendant and had no chance to succeed.

3.18   By 2008, the sale of agencies by the Brooke entities essentially ended and Brooke imploded.  On October 28, 2008, Brooke Corporation and Brooke Capital Corporation filed bankruptcy in the United States District Court of the District of Kansas.  Defendant was suspiciously kept out of bankruptcy.

3.19   By early to mid 2008, the Brooke entities' fraud began to be uncovered by multiple parties, including the FBI and SEC.  Around this time, Plaintiffs learned information that indicated that Defendant had sold, transferred or assigned all or portions of their loans to undisclosed third parties through various transactions including loan participation and securitization agreements.  The Agreements for Advancement of Loan state that Aleritas "may assign or delegate all or any part of its rights, title, interest or obligations in and to this agreement or under any loan document to one or more persons without the consent of the borrower."  However, no one ever informed Plaintiffs that their loans had been sold before Brooke's

downfall.  Up until the summer of 2008, Plaintiffs continued to get monthly reports from the Brooke entities indicating loan payments were being made to Defendant.  Despite any sale, transfer or assignment of Plaintiffs' loans by Aleritas, any entity that holds Plaintiffs' loans are subject to Plaintiffs' claims and defenses against Defendant and the other Brooke entities.

3.20    Plaintiffs primary source of revenue is insurance commissions.  By August 2008, the Brooke entities stopped paying commissions.  However, Plaintiffs were still charged for their fraudulent loans.  In late October 2008, the Special Master appointed to operate the Brooke entities, Albert Reiderer, released Plaintiffs from their Franchise Agreements.  However, since that time Plaintiffs have not received the majority of their commissions.  Moreover, Plaintiffs have continued to be charged for the fraudulent loans made by Defendant.

3.21    Since Brooke's implosion, Plaintiffs have been contacted by various lending institutions who claim to own their loans.  These institutions have attempted to collect on the loans that they knew or should have known were fraudulent.  The collection efforts have included, but are not limited to, interference with Plaintiffs' agreements with various insurance companies for commissions.  Specifically, the lending institutions have attempted to have the insurance companies send Plaintiffs' commissions to them.

### IV.
### CAUSES OF ACTION

#### A.    Fraud & Fraud in the Inducement

4.1    Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

4.2    Plaintiffs borrowed money from Defendant for the purchase of the agencies from Brooke Capital or related company.  In connection with the loan agreements, Plaintiffs executed an Agreement for Advancement of Loan with Defendant.

4.3     Defendant and the other Brooke entities intentionally and/or with reckless disregard for the truth committed omissions and misrepresentations of material fact in their conduct with Plaintiffs.  Defendant and the other Brooke entities made the following misrepresentations and omissions in faxes, mailed correspondence, emails, and telephone conferences:

      a.     the commissions and the value of the agencies Plaintiffs were purchasing;

      b.     the Consulting Agreements between the Brooke entities and the third party sellers of the insurance agencies;

      c.     the consulting and valuations services provided by the Brooke entities;

      d.     other misrepresentations as to how the franchise relationship would operate.

4.4     Defendant and the other Brooke entities intended that all agents, including Plaintiffs, would rely upon these material misrepresentations and omissions to induce prospective franchisees, including Plaintiffs, to enter into the purchasing, financing and franchise agreements.   Plaintiffs relied upon Defendant and the other Brooke entities material misrepresentations and have suffered substantial damage as a result.  The conduct of Defendant and the other Brooke entities constitutes fraud and fraud in the inducement.

4.5     Plaintiffs had no knowledge that Defendant and the other Brooke entities' representations were false.

4.6     Plaintiffs will suffer substantial harm if the loan agreements, including but not limited to the Agreements for Advancement of Loan, are not rescinded and their consideration returned, since the services received under the contracts are useless for the purposes for which it was purchased and intended.  Monetary damages would not adequately compensate for the loss of the bargain.

4.7     Plaintiffs will further show that the conduct of Defendants as described above was willful

and/or malicious.   As a result, Plaintiffs are entitled to recover exemplary damages to deter future acts of fraud and misrepresentations such as those which were perpetrated upon Plaintiffs. In this connection, Plaintiffs will show that, as a result of Defendant and the other Brooke entities' conduct, Plaintiffs have suffered losses of time and other expenses, including attorney's fees, incurred in the investigation and prosecution of this action.   Accordingly, Plaintiffs respectfully request that exemplary damages be awarded against the Defendant in a sum within the jurisdictional limits of the Court.

4.8     Although multiple companies were involved in establishing and maintaining the Brooke franchise network, they were all controlled by Robert Orr or the same small group of people that reported to Robert Orr.   Defendant and the other Brooke entities jointly acknowledged and conspired to, and did in fact accomplish, the fraud and the fraud in the inducement, referenced in the paragraphs above.   The Brooke entities had knowledge of the object and purpose of the conspiracy and were in agreement and intended to inflict a wrong on Plaintiffs.   Defendant's wrongful acts proximately caused damages to Plaintiffs within the minimum jurisdictional limits of this Court of which Defendant, as a co-conspirator, is jointly and severally liable.

### B.      Negligent Misrepresentation

4.9     Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

4.10    As forth above, the Brooke entities, including Defendant, made representations to Plaintiffs in the course of the Brooke entities' business or in a transaction in which the Brooke entities had an interest.   The Brooke entities, including Defendant, applied false information for the guidance of others.   The Brooke entities, including Defendant did not exercise reasonable care or competence in obtaining or communicating the information.   The Plaintiffs justifiably relied on the representations made by the Brooke entities.   Finally, the Brooke entities' negligent

misrepresentations proximately caused the Plaintiffs' injury.

### C.     Civil RICO

4.11    The Brooke entities, including Defendant, have violated 18 U.S.C. § 1962 (a) and (d). Plaintiffs hereby incorporate by reference the preceding paragraphs.  In addition, Plaintiffs would show that they were induced into the agreements, including the loans and Agreement for Advancement of Loan, with the Brooke entities by both wire and mail fraud, this being the predicate activity of racketeering beginning in at least 2002.  Plaintiffs were induced by the Brooke entites' material misrepresentations that were made specifically to induce Plaintiffs into the transactions, and Plaintiffs relied on these fraudulent misrepresentations to their detriment.

### 1.     Section 1962(a)

4.12    Section 1962(a) makes it unlawful for any person who has received any income derived from a pattern of racketeering activity to use or invest  any part of such income in acquisition of any interest in, or  the establishment or operation of, any enterprise.  One racketeering scheme that occurred works like this: The association in fact/enterprise consisted of The American Agency, Inc., The American Heritage, Inc., Brooke Capital Corporation, Aleritas, Brooke Corporation and other affiliated companies.  The American Agency, Inc. and The American Heritage, Inc. are represented to be independent appraisal companies, which "appraised" a third party agency, which is the target agency for sale.  The appraisal company allegedly advises the target agency that the agency is worth a sum certain and charges a fee for this service through the Consulting Agreement.  At the same time, the same appraisal company which is also a subsidiary or affiliated company to Brooke Capital Corporation, advises the prospective purchaser (here, Plaintiffs) that it has performed an independent assessment of the target agency's commissions

and value.  The Brooke entities charge a substantial fee (approximately 50% of represented annual commissions of the target agency) for this service in the form of a Buyer's Assistance Plan (BAP).  In association with these two subsidiaries/affiliates, then, Brooke Capital purchases the target agency and then turns around the same day (or very soon thereafter) and sells it to Plaintiffs and adds unnecessary and duplicative fees and expenses.  The net result is that the Brooke entities do no real evaluation of the target agency and Brooke Capital purchases the agency at a substantially lower price than they sell it to Plaintiffs.  Brooke Capital sells the agency to the prospective purchaser/Plaintiffs through a sales and franchise agreement, along with other ancillary agreements, and so makes a profit, unbeknownst to the Plaintiffs, on the sale price, and then profits by charging usurious interest in the financing of the agency, exorbitant and unearned fees, not paying full commissions to Plaintiffs and other unlawful actions.  The Brooke entities charge a fee for their analyses, which, in reality, is nothing more than a cursory review of the target agency's records.  Moreover, the fees are actually charged and credited to Brooke Capital.  The monies obtained therefrom are used to promote and operate the enterprise. The representations made concerning the independence of the "appraisal" and the value of the target agencies is fraudulent, and is relied upon by the Plaintiffs in entering into the transaction with Brooke Capital and the loans from Aleritas.  These subsidiary/affiliated companies assume a distinct role in facilitating and masking the Brooke entities' fraud, and make misrepresentations and fraudulent omissions in order to induce Plaintiffs into the transaction, including the Agreement for Advancement of Loan.  Moreover, the decision to operate through subsidiaries and/or affiliated companies rather than divisions facilitated the unlawful activity of the enterprise.  The Brooke entities have entered into a number of these financing and franchising arrangements, all with the same entities and functions of these entities.  As a result, the Brooke

entities have engaged in pattern and practice of racketeering activity.   This conduct has damaged Plaintiffs.

      **2.**      **Section 1962(d)**

4.13   Section 1962 (d) makes it unlawful for any person to conspire to violate subsection (a). The Brooke entities conspired with one another to violate subsection (a), as they all worked in concert, to accomplish a number of unlawful and fraudulent transactions as described herein. They agreed and conspired to commit two or more predicate racketeering acts, e.g. to make material misrepresentations by mailed correspondence, emails, and telephone conferences both soliciting/inducing Plaintiffs and explaining the transactions, as well as the Brooke entities' services, were all accomplished by the Brooke entities working together to accomplish (i)  the goal of inducing franchisees into the various transactions described herein (ii)    inflating the value of the agency being purchased, (iii)  by retaining an unreasonably high amount of the commissions, the percentage of which is above the industry standards, (iv)   delaying payment and providing insufficient records of the commissions due, making it impossible for the franchise agents to survive or succeed, (v) and then, when the agency falls behind in its payments to Defendant, the Brooke entities taking over the agency from the franchise agent.  The object of the conspiracy was to use unlawful means, i.e. fraud, wire and mail fraud, and negligent misrepresentation through lawful means, or in the alternative, a lawful purpose through unlawful means.  The result of such conspiracy has damaged Plaintiffs.

**V.**
**DISCOVERY RULE**

5.1     The Brooke entities course of action, from inception of the business relationship through the current relationship between the parties, has been fraudulent and subversive.  Over the years, Defendant and the other Brooke entities have mastered their collective ability to convince

franchisees that it is them, the franchisees, who simply do not understand the system or the specific situation when franchisees have raised issues and/or concerns.  The Brooke entities have also assured franchisees that it would never take a position which would hurt them.  As a result, franchisees, including Plaintiffs, had no reasonable basis to believe that the Brooke entities, including Defendant, were committing acts which are compensable under the law.  Injuries arising from the conduct by the Brooke entities are inherently undiscoverable.

**VI.**
**FRAUDULENT CONCEALMENT**

6.1     The Brooke entities, including Defendant, at all times, had actual knowledge of the wrongs they committed against Plaintiffs.  The Brooke entities at all times, also had total control of Plaintiffs' billing practices and ownership and possession of all sales commissions.  Additionally, at all relevant times pursuant to other documents, the Brooke entities were in total control of the accounting procedures for all sales commissions and the information about the agencies from the third party sellers.

6.2     The Brooke entities' continuous and active suppression of the truth prevented Plaintiffs from discovering the truth with regards to the fraudulent acts and omissions.  The Brooke entities made numerous misrepresentations and remained silent when they had an obvious and unequivocal duty to speak.  The Brooke entities' intentional misrepresentations were made to influence and induce Plaintiffs into agreeing to the terms of the various agreements.

6.3     Plaintiffs reasonably relied on the Brooke entities' misrepresentations and silence to their detriment.  Plaintiffs reasonably relied on the Brooke entities' conduct, despite exercising reasonable diligence, and had no reason to disbelieve the Brooke entities misrepresentations or question the Brooke entities' silence.

WHEREFORE, Plaintiffs request that the Defendant be cited to appear and answer

herein, that Plaintiffs be granted temporary and permanent injunctive relief and that upon final

hearing, Plaintiffs be granted judgment against Defendant for all damages, attorney's fees,

expenses, court costs, along with all applicable pre-judgment interest and post-judgment interest

as allowed by law, a declaration that the loans and any interest on the loans are cancelled,

including the Agreement for Advancement of Loan, and for such other and further relief to

which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

GRAVELY & PEARSON, L.L.P.
425 Soledad, Suite 600
San Antonio, Texas 78205
Telephone: (210) 472-1111
Facsimile: (210) 472-1110

By: _Matthew R. Pearson_
      Matthew R. Pearson
      State Bar No. 00788173
      Marc E. Gravely
      State Bar No. 00787582


KRIGEL & KRIGEL, P.C.
4550 Belleview
Kansas City, Missouri 64111
Telephone: (816) 756-5800
Facsimile: (816) 756-1999

By: /s/ Erlene W. Krigel
      Erlene W. Krigel
      Kansas Bar No. 70425
      Kelsey P. Nazar
      Kansas Bar No.

ATTORNEYS FOR PLAINTIFFS


**JURY DEMAND**

PLAINTIFFS REQUEST A TRIAL BY JURY

## DESIGNATION OF LOCATION FOR HEARINGS/TRIAL

PLAINTIFFS REQUEST THAT KANSAS CITY, KANSAS BE DESIGNATED AS THE
LOCATION FOR HEARINGS AND TRIAL.